# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00173-SCT

*BETTY G. HARTEL AND HUSBAND, WALDO
HARTEL*

*v.*

*JACK B. PRUETT, M.D., SPECTRUM
EMERGENCY CARE, INC. d/b/a SEC/EM CARE
AND BILOXI REGIONAL MEDICAL CENTER
a/k/a BILOXI HMA, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/30/2005 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | L. CHRISTOPHER BREARD |
| ATTORNEYS FOR APPELLEES: | MARK P. CARAWAY |
| | L. CLARK HICKS, JR. |
| | LYNDA CLOWER CARTER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 11/13/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1. This case arises from a claim of medical malpractice against Dr. Jack B. Pruett, an emergency room physician who purportedly failed to prescribe the proper antibiotics to patient Betty G. Hartel. After all parties rested, the Circuit Court of Harrison County, Mississippi, granted a directed verdict for Spectrum Emergency Care, Inc. ("EM Care"). The jury subsequently returned a verdict in favor of Dr. Pruett and Biloxi Regional Medical

Center ("Biloxi Regional"). After denial of their post-trial motions, Betty and her husband, Waldo Hartel (collectively, "the Hartels"), filed this appeal.

**FACTS**

¶2. Sixty-eight-year-old Betty Hartel took a pain reliever when she began experiencing severe lower abdominal pain. However, her pain increased, so Waldo contacted Betty's physician, Dr. Lee Morris. Dr. Morris instructed Waldo to take her to the emergency room. Following admission to Biloxi Regional, she provided blood and urine samples, and her vital signs were obtained. Her blood pressure was slightly elevated, while all other results were normal. Dr. Pruett, an emergency room physician, examined Betty. Dr. Pruett listened with a stethoscope as he pressed on the lower left side of her abdomen, where she was experiencing pain. Dr. Pruett found no rebound tenderness or signs of a hernia during the examination. Dr. Pruett's initial differential diagnosis included diverticulitis, a urinary tract infection, or a urinary stone. Her urinalysis revealed no sign of blood or bacteria, although her blood tests revealed an elevated white blood cell count. Dr. Pruett diagnosed Betty with acute mild diverticulitis of the sigmoid colon.[1] Dr. Pruett prescribed Ciprofloxacin[2] for Betty, injected her with Demerol to alleviate the pain, and sent her home with the instruction to "follow-up" with Dr. Morris.

---

[1] Diverticulitis is an infection inside a diverticulum (plural: diverticula), which is a pouch or sack that forms in the colon. The sigmoid colon is the segment of the colon on the left side of one's body, just above the rectum. Betty had been diagnosed with diverticulosis, the formation of diverticula, approximately twenty-five years earlier.

[2] An antibiotic of the quinolone family marketed under the trade name Cipro.

¶3.     Betty returned home that evening and was experiencing significantly less pain the next morning. She remained in bed the following two days, taking the Cipro and pain medication prescribed by Dr. Pruett. However, on May 15, 1998, Betty awoke with significant pain in her vaginal area. Waldo then contacted Dr. Morris, who instructed Waldo to take Betty to a gynecologist. After conducting a pelvic examination, the gynecologist concluded that Betty needed to be sent to the hospital.

¶4.     Betty returned to Biloxi Regional and underwent an exploratory laparotomy. A surgeon, Dr. Jefferson McKenney, discovered an abscess in Betty's pelvic area and a perforated diverticulum in her sigmoid colon. Dr. McKenney removed approximately fifteen inches of Betty's colon and her appendix due to inflammation from the perforated diverticulum, and then performed a colostomy.

¶5.     Five weeks later, Dr. McKenney reversed Betty's colostomy. Because a significant portion of her colon was removed, Betty now has little time in which to reach a bathroom. She has also undergone additional surgeries to repair hernias resulting from the colostomy-bag incision.

¶6.     On September 20, 1999, Betty and Waldo filed suit in the circuit court against Dr. Pruett and EM Care, the provider of emergency room physicians to Biloxi Regional. The Hartels alleged that Dr. Pruett had committed multiple negligent acts in treating Betty at Biloxi Regional and that EM Care was liable for his negligence under the doctrine of respondeat superior. The answers of both Dr. Pruett and EM Care admitted that EM Care provided emergency room physicians to Biloxi Regional, but denied that Dr. Pruett was employed by EM Care.

3

¶7. Thereafter, the Hartels amended their complaint and alleged that Dr. Pruett "was employed by and/or under contract with and/or an agent of" EM Care.[3] A second amended complaint added Biloxi Regional as a defendant, alleging that Biloxi Regional was liable for Dr. Pruett's negligent acts under the doctrine of respondent superior. The second amended complaint further asserted a negligent hiring claim against both EM Care and Biloxi Regional.[4] In response, EM Care continued to deny that it was Dr. Pruett's employer, but admitted that "it entered into a contract with [Biloxi Regional], the terms of which will speak for themselves." Biloxi Regional's answer asserted cross-claims against Dr. Pruett and EM Care for contractual and common-law indemnification. Biloxi Regional noted that it "entered into an Emergency Services Agreement with" EM Care in 1996. Regarding Biloxi Regional's cross-claims, EM Care admitted that it had a duty to indemnify Dr. Pruett for the claims asserted against him by the Hartels under the theory of respondeat superior. EM Care further admitted that "it ha[d] a duty of indemnification to . . . Biloxi Regional . . . , but only based upon the contractual indemnification for the *respondeat superior* of Biloxi Regional . . . , which is denied."

¶8. On June 21, 2005, a jury trial commenced. When the Hartels rested, EM Care moved for a directed verdict claiming that the Hartels had failed to present any evidence of an employment relationship between Dr. Pruett and EM Care. The trial court reserved its

---

[3]In their original complaint, the Hartels had alleged merely that EM Care was the "employer of" Dr. Pruett.

[4]Biloxi Regional filed a Rule 42(b) motion on the negligent-hiring claims, later joined by Dr. Pruett and EM Care. The trial court bifurcated that claim, to be heard by the same jury, if the Hartels succeeded in their medical malpractice claim.

4

decision until after the defense rested, at which time the circuit court granted EM Care's motion for directed verdict. The case was then submitted to the jury, and the jury returned a verdict in favor of Dr. Pruett and Biloxi Regional. After the Hartels' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was denied by the circuit court, they filed this appeal.

**ISSUES**

¶9. This Court will consider:

(1) Whether the circuit court abused its discretion in excluding reference to specific medical texts due to the lack of seasonable supplementation.

(2) Whether the circuit court abused its discretion in refusing to allow defense expert Dr. Michael Stodard to be cross-examined on a New England Journal of Medicine article.

(3) Whether the circuit court abused its discretion in allowing Dr. Pruett to refer to a medical text which was not disclosed prior to trial.

(4) Whether the circuit court abused its discretion in refusing to allow the Hartels to call Dr. Pruett adversely via an edited video deposition.

(5) Whether the circuit court abused its discretion in allowing Dr. Pruett and his expert witnesses to testify about their own practice and the practice of other physicians in the community which they observed, regarding prescribing antibiotics for acute mild diverticulitis.

(6) Whether the circuit court erred in granting EM Care's motion for directed verdict.

(7) Whether the jury's verdict was against the overwhelming weight of the evidence.

## ANALYSIS

### I.    Evidentiary Rulings[5]

¶10.    An abuse-of-discretion standard of review is applied to the trial court's admission or exclusion of evidence. *See **Tunica County v. Matthews***, 926 So. 2d 209, 212 (Miss. 2006) (citation omitted).

        **A.    Whether the circuit court abused its discretion in reference to specific medical texts due to the lack of seasonable supplementation.**

¶11.    On April 17, 2000, Dr. Pruett propounded an interrogatory requesting that the Hartels "[i]dentify all treatises to be used in direct examination at the trial of this case."[6] The Hartels answered that they would "respond and supplement in strict accordance with Rule 803(18)." On June 15, 2005, six days prior to trial, counsel for the Hartels sent a fax to counsel for defendants providing the names of several medical articles which might be used during the Hartels' case-in-chief. Thereafter, Dr. Pruett and EM Care filed a joint motion in limine seeking to exclude these medical articles because they were not timely disclosed. On June 19, 2005, counsel for the Hartels faxed the medical articles to counsel for the defendants. The circuit court ruled that because the Hartels had failed to seasonably disclose their

---

[5]Issues (1) - (5) *supra* will be discussed under this section.

[6]Dr. Pruett further requested that the Hartels produce all treatises they planned to use at trial. In response, the Hartels stated that they would produce any treatises upon which their expert witnesses would be relying at trial.

intention to use the medical articles at trial, the Hartels' expert witnesses could not rely upon or refer to them on direct examination.[7]

¶12.    On appeal, the Hartels first contend that they were required only to disclose the medical articles prior to trial.  They maintain that Mississippi Rule of Evidence 803(18) merely provides that treatises, periodicals, and pamphlets "must be disclosed . . . pursuant to discovery."  Miss. R. Evid. 803(18).  Next, the Hartels argue that their disclosure was not untimely, as they did not gather the medical articles until May 2005.[8]  Finally, the Hartels assert that the proximity of their disclosure to the date of trial did not prejudice the defendants because adequate time remained for their expert witnesses to review the medical articles prior to trial.

¶13.    In response, the defendants maintain that the Hartels had a duty under Mississippi Rule of Civil Procedure 26(f) to seasonably supplement their discovery response to the interrogatory regarding what treatises would be used at trial; that the Hartels' disclosure of the subject medical articles only six days before trial was not a seasonable supplementation; and that the Hartels' untimely disclosure unduly prejudiced the defendants, as their attorneys and expert witnesses were not provided sufficient pre-trial time in which to adequately examine these complex articles and prepare to refute them.

¶14.    Mississippi Rule of Civil Procedure 26(f)(1) provides, in relevant part, that:

---

[7]However, the circuit court added that counsel for the Hartels could use the subject medical articles during cross-examination of the defendants' expert witnesses.

[8]Counsel for the Hartels claims that he was unaware of the need to support their expert witnesses' opinions with medical literature until April 2005, when the defendants filed their designations of expert witnesses and disclosed the substance of their testimony.

7

(1) A party is under a duty seasonably to supplement that party's response with respect to any question directly addressed to . . . (B) the identity of each person expected to be called as an expert witness at trial, *the subject matter on which the person is expected to testify, and the substance of the testimony.*

Miss. R. Civ. P. 26(f)(1) (emphasis added). This Court "has laid down no hard and fast rule as to what amounts to seasonable supplementation . . . ." **Eastover Bank for Savs. v. Hall**, 587 So. 2d 266, 272 (Miss. 1991). "[S]easonableness must be determined on a case by case basis looking at the totality of the circumstances surrounding the supplemental information the offering party seeks to admit." **Blanton v. Bd. of Supervisors**, 720 So. 2d 190, 196 (Miss. 1998).

¶15.   In **Blanton**, this Court held that the trial court's exclusion of an appraiser's supplemental report, disclosed six days before trial, was not an abuse of discretion. *See* **Blanton**, 720 So. 2d at 196. This Court found that the opposing party was prejudiced because of the "inherent complexity" of the case, "coupled with the crucial nature of the appraiser's report." *Id*. The opposing party simply was not afforded sufficient time prior to trial to prepare a rebuttal to the supplemental report. *See id*.; **Square D Co. v. Edwards**, 419 So. 2d 1327, 1329 (Miss. 1982) ("[o]ne of the principal reasons for permitting interrogatories for pretrial discovery of the opinion held by experts and the substance of their testimony is to prevent trial by ambush and surprise . . . .").

¶16.   If counsel for the Hartels had disclosed the medical articles to the defendants shortly after gathering them in May 2005, the supplementation may have been seasonable. However, the circuit court ruled that the disclosure only six days prior to trial provided insufficient time for defendants' counsel adequately to prepare a rebuttal in the case sub

8

judice, i.e., to let their expert witnesses read the articles, confer thereon, and retrieve medical literature supporting their position. As in ***Blanton***, the complexity of this case and the importance of the subject medical articles to the Hartels' case support the circuit court's finding that admission would have prejudiced the defendants. Accordingly, this Court finds that the circuit court did not abuse its discretion in foreclosing the Hartels' expert witnesses from relying upon or referring to the subject medical articles on direct examination.

**B.      Whether the circuit court abused its discretion in refusing to allow defense expert Dr. Michael Stodard to be cross-examined on a New England Journal of Medicine article.**

¶17.    The Hartels contend that the circuit court abused its discretion by not allowing them to use a New England Journal of Medicine ("Journal") article concerning acute diverticulitis to cross-examine Dr. Michael Stodard. Specifically, they argue that "Dr. Stodard testified the [Journal] was generally reliable and well[-]respected." Therefore, they maintain that, pursuant to Mississippi Rule of Evidence 803(18), Dr. Stodard "should have been allowed to be cross-examined." The defendants reply that Dr. Stodard "admitted the [Journal] was respected in the medical community, but could not agree the Journal was generally authoritative or relied upon by the medical community." Accordingly, they assert that the circuit court "correctly ruled that the test provided in the Rules of Evidence had not been met." The defendants add that because the Hartels "put before the jury the statements from the [Journal] through cross-examination of Dr. [George] McGee, absolutely no prejudice to [the Hartels] resulted by not allowing Dr. Stodard to discuss this article; and no substantial right of [the Hartels] was adversely affected."

¶18.    Mississippi Rule of Evidence 803(18) provides, in pertinent part, that:

9

[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

(18) To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, *established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.* If admitted, the statements may be read into evidence but may not be received as exhibits.

Miss. R. Evid. 803(18) (emphasis added). Dr. Stodard testified that the Journal was "well-respected" in the medical community, but he refused to concede that it was a reliable authority.[9] The following exchange took place between counsel for the Hartels and Dr. Stodard:

Q: Doctor, in the medical community do you recognize generally speaking the [Journal], a peer reviewed periodical, as being a generally reliable authority?

A: I would answer yes and did answer yes when you asked me if it was respected. Yes, it is respected by some. For me to know if it's reliable or not I would have to subscribe and read it on a regular basis which I never have and do not. So, no, sir, I cannot answer the question that it is reliable. *I certainly would strongly disagree that it is authoritative.*

Q: My question to you is in the medical community is the [Journal] generally accepted as a generally reliable source of medical information, peer review[ed] medical information, used by physicians.

A: Again, my answer would be only I can determine if it's reliable in my mind. . . . I cannot say it is reliable, no, sir.

---

[9]According to Dr. Stodard:

it's like any journal. There are certain articles that are going to show up in it that physicians may or may not agree with, and that's why you have editorials and physicians writing in to comment on certain articles and certain practices that are discussed in there that all physicians don't agree with.

10

[Counsel for the Hartels]: He's missing my question, Your Honor.

A: I cannot say that it is generally reliable among all physicians in the United States.

Q: I didn't say among all physicians. *The question is, is it generally reliable among physicians in general –*

A: *I cannot agree with that statement, no, sir.*[10]

(Emphasis added). Based on this testimony, the circuit court ruled that the Journal had not been "established as a reliable authority[,]" under Mississippi Rules of Evidence 803(18), and refused to allow the Hartels to cross-examine Dr. Stodard using the Journal article.

¶19. The circuit court's evidentiary rulings are subject to an abuse-of-discretion standard of review. *See Matthews*, 926 So. 2d at 212. Neither Dr. Stodard, nor any other expert witness, testified that the Journal was a "reliable authority." Miss. R. Evid. 803(18). Therefore, neither the Journal, nor the subject article contained therein, was "established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice." Miss. R. Evid. 803(18). Accordingly, this Court cannot find that the circuit court abused its discretion in ruling that the Journal article could not be used during the cross-examination of Dr. Stodard.

C. **Whether the circuit court abused its discretion in allowing Dr. Pruett to refer to a medical text which was not disclosed prior to trial.**

¶20. The defendants designated Dr. Pruett as an expert witness, but did not provide that his expert opinions were based upon any medical literature or that any medical literature would

---

[10]Dr. Stodard later reiterated that "I cannot say that [the Journal] is generally reliable."

11

be introduced to provide support for his opinions. At trial, counsel for the Hartels called Dr. Pruett as an adverse witness. During cross-examination, the following exchange occurred between counsel for the Hartels and Dr. Pruett:

Q: I want you to cite me one article that you're relying on for that testimony which has not been provided. I want to know one article that you're citing that says Cipro alone is just as effective for diverticulitis treatment as aerobic and anaerobic coverage. You don't have one recent article that says that, do you? . . .

A: I do have some other articles that are guides that emergency physicians go by . . . in emergency medicine. And one is an emergency medicine pediatric and adult textbook that's a reference text.

Q: Is that something you're relying on?

A: Well, it's something that . . . a lot of the emergency room physicians rely on. It's a reference source.

Q: Are you relying on that document for your opinions?

A: No.

¶21.    Thereafter, defense counsel moved for the circuit court to allow them to refer to the referenced text, "Griffith's 5 Minute Clinical Consult," during their examination of Dr. Pruett. The defendants argued that, "we just feel like he opened the door by asking the doctor – he put the doctor on the defensive with the question to the effect that there are no articles that would support your view. So we feel like we have a right to rebut that." Counsel for the Hartels objected to the defendants' motion on the ground that the reference text was not disclosed prior to trial.[11] The circuit court overruled the objection, concluding

_____

[11]As the Hartels argue on appeal, "[t]he [c]ourt surely abused its discretion in allowing this evidence especially since it was completely contradictory of the [c]ourt's prior ruling regarding the use of [the] Hartels' medical literature." *See* Issue I.(A.) *supra*.

12

"[i]n view of the fact it was brought out on cross-examination . . . , I'm going to overrule any objection."

¶22.    In *APAC-Mississippi, Inc. v. Goodman*, 803 So. 2d 1177 (Miss. 2002), this Court stated:

> [t]he Missouri Court of Appeals has ruled that, as a general rule, the issue of whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence, lies within the sound discretion of the trial court. *See Duckett v. Troester*, 996 S.W.2d 641, 649 (Mo. Ct. App. 1999). We find that the abuse of discretion standard is appropriate . . . .

*Goodman*, 803 So. 2d at 1185. Although Dr. Pruett did not furnish "Griffith's 5 Minute Clinical Consult" in discovery, counsel for the Hartels "opened the door" by questioning Dr. Pruett with an open-ended challenge to "cite me one article[,]" he referenced from "Griffith's 5 Minute Clinical Consult." Once the door had been opened, the defendants were entitled to present the "otherwise inadmissible evidence" to rebut the suggestion that there were no articles to support Dr. Pruett's view. Accordingly, this Court finds that the circuit court did not abuse its discretion in deeming this medical text admissible.

> **D.    Whether the circuit court abused its discretion in refusing to allow the Hartels to call Dr. Pruett adversely via an edited video deposition.**

¶23.    Counsel for the Hartels took a videotape deposition of Dr. Pruett on December 10, 2003. On June 13, 2005, the Hartels notified the defendants of their intention to play an edited version of the videotape deposition at trial instead of calling Dr. Pruett as an adverse witness. The circuit court denied the Hartels' motion. The Hartels assert that this ruling constitutes an abuse of discretion, claiming that Mississippi Rule of Civil Procedure 32(a)(2) permits a party to use the deposition of the opposing party as desired.

13

¶24.    Mississippi Rule of Civil Procedure 32(a) states, in pertinent part, that:

(a) At the trial or upon the hearing of a motion of an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

(1) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Mississippi Rules of Evidence.

(2) The deposition of a party . . . may be used by an adverse party for any purpose. . . .

(4) If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which ought in fairness to be considered with the part introduced, and any party may introduce any other parts.

Miss. R. Civ. P. 32(a).  Mississippi Rule of Evidence 801(d)(2)(A) provides, in relevant part, that "(d) [a] statement is not hearsay if: . . . (2) [t]he statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity . . . ." Miss. R. Evid. 801(d)(2)(A).  A party may enter portions of an opposing party's deposition into evidence without calling the opposing party as a witness, provided that the portions of the deposition are admissible under Rule 801.  *See McMillan v. King*, 557 So. 2d 519, 526 (Miss. 1990).  In *McMillan*, the trial court did not allow the plaintiff to enter portions of the deposition of the opposing party's employee. *See id*. at 525.  This Court found the plaintiff "should have been permitted to enter the proffered portions of [the deposition of the opposing party's employee] into evidence without calling [the opposing party's employee] as a

witness. This is so even though [the opposing party's employee] was available to be called as a witness." *Id*. at 526. However, this Court further found that:

> the record discloses that [the testimony of the opposing party's employee] pertinent to McMillan's case was elicited from [the opposing party's employee] as an adverse witness. Where that testimony differed from [the deposition of the opposing party's employee], McMillan was freely allowed to impeach . . . with the parts of the deposition McMillan wished [to] enter in evidence. Because McMillan got before the jury the points he had proffered via cross-examination of [the opposing party's employee], we hold the error legally harmless.

*Id*.

¶25. Based upon *McMillan*, the circuit court erred in refusing to allow the Hartels to play the edited video deposition of Dr. Pruett. However, this error was "legally harmless," *id*., because the Hartels were permitted to examine Dr. Pruett and then impeach him with his videotaped deposition statements on cross-examination, if inconsistent with his live testimony. Accordingly, this Court finds that this issue is without merit.

> **E.     Whether the circuit court abused its discretion in allowing Dr. Pruett and his expert witnesses to testify about their own practices and the practices of other physicians in the community which they observed, regarding prescribing antibiotics for acute mild diverticulitis.**

¶26. Dr. Pruett[12] and Dr. George McGee were permitted to testify, over the Hartels' objection, regarding antibiotics other emergency room physicians prescribe for acute mild diverticulitis. The Hartels argue that this testimony constituted inadmissible hearsay, lacked the proper foundation, and was outside the designations of these expert witnesses.

---

[12]Dr. Pruett testified as both a fact and expert witness.

15

¶27. Regarding hearsay, the testimony of Dr. Pruett and Dr. McGee did not quote other physicians. Their testimony was based upon their personal observations of the antibiotic regimens employed by other emergency room physicians in treating patients suffering from acute mild diverticulitis. Accordingly, because their testimony was based on personal observation and knowledge, the Hartels' contention that no proper foundation was laid lacks merit. Moreover, this testimony was within their expert designations, as it was given for the purpose of establishing the standard of care. Therefore, this Court finds that the circuit court did not abuse its discretion in allowing the above-referenced testimony.

**II.   Whether the circuit court erred in granting EM Care's motion for directed verdict.**

¶28. In reviewing the circuit court's grant of EM Care's motion for directed verdict, this Court considers "whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated." *Spotlite Skating Rink, Inc. v. Barnes*, 988 So. 2d 364, 368 (Miss. 2008) (quoting *White v. Stewman*, 932 So. 2d 27, 32 (Miss. 2006)).

¶29. EM Care's motion for directed verdict maintained that no evidence had been introduced demonstrating the existence of an employment relationship between EM Care and Dr. Pruett. The circuit court granted EM Care's motion because the record lacked any mention of EM Care. On appeal, the Hartels claim, over EM Care's vigorous denial, that EM Care admitted in its pleadings that it was Dr. Pruett's employer and, therefore, could be held vicariously liable under the doctrine of respondeat superior if Dr. Pruett was deemed negligent in treating Betty.

16

¶30. In its answer to Biloxi Regional's cross-claim, EM Care merely admitted that it had a "duty of indemnification" to Biloxi Regional for the negligence of Dr. Pruett. In short, EM Care did not admit that Dr. Pruett was its employee. In Biloxi Regional's motion for separate trial, later joined by EM Care, it is asserted that EM Care "contracted with [Biloxi Regional] to furnish physicians to staff the Emergency Department at the hospital." Again, this statement does not constitute an admission by EM Care that it employed Dr. Pruett.

¶31. Regardless, no evidence was presented at trial linking EM Care to Dr. Pruett. Absent proof of an employment relationship, the evidence was "either so indisputable, or so deficient, that the necessity of a trier of fact [was] obviated," *id*., and the circuit court had no alternative but to grant EM Care's motion for directed verdict. *See Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992) ("[a] trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree.") (citations omitted). Accordingly, this Court finds that this issue is without merit.[13]

---

[13]Assuming *arguendo* that this issue had merit, it is moot in light of the jury's exoneration of Dr. Pruett.

**III.    Whether the jury's verdict was against the overwhelming weight of the evidence.**

¶32.    "A motion for new trial challenges the weight of the evidence. *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999). A reversal is warranted only if the trial court *abused its discretion* in denying a motion for new trial." *Ivy v. State*, 949 So. 2d 748, 753 (Miss. 2007) (emphasis added). In *Bush v. State*, 895 So. 2d 836 (Miss. 2005), this Court set out the standard of review for weight of the evidence, stating:

> [w]hen reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997). We have stated that on a motion for new trial[:]
>
>> the court sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.
>
> *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000). . . . [T]he evidence should be weighed in the light most favorable to the verdict. *Herring*, 691 So. 2d at 957.

*Bush*, 895 So. 2d at 844.

¶33.    "[I]n order to prevail in a medical malpractice action, a plaintiff must establish, by expert testimony, the standard of acceptable professional practice; that the defendant physician deviated from that standard; and that the deviation from the standard of acceptable professional practice was the proximate cause of the injury of which plaintiff complains." *Brown v. Baptist Mem'l Hosp.-DeSoto, Inc.*, 806 So. 2d 1131, 1134 (Miss. 2002) (citations omitted). Regarding the applicable standard of care, this Court has stated that:

18

each physician has a duty to use his or her knowledge and therewith treat through medical recovery, each patient, with such reasonable diligence, skill, competence, and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available . . . to them the same general facilities, services, equipment and options.

*McCaffrey v. Puckett*, 784 So. 2d 197, 203 (Miss. 2001) (quoting *Hall v. Hilbun*, 466 So. 2d 856, 873 (Miss. 1985)). The issue here is whether Dr. Pruett deviated from this standard of care by prescribing only Cipro. The Hartels maintain that Dr. Pruett breached the standard of care in failing to prescribe an antibiotic for Betty that was effective against anaerobic bacteria, in addition to Cipro.

¶34. At trial, the Hartels called Dr. Ernest Kleier and Dr. Joseph Blackston as expert witnesses. Each testified that Dr. Pruett's treatment of Betty failed to satisfy the standard of care because Betty was not prescribed antibiotics for both aerobic and anaerobic bacteria. Dr. Kleier testified that "it's common knowledge from medical students to residents to treating physicians" that both aerobic and anaerobic bacterial organisms are located in the colon. He explained that aerobic bacteria grow in the presence of oxygen, while anaerobic bacteria grow in the absence of oxygen. As such, both Dr. Kleier and Dr. Blackston asserted that, in order to meet the standard of care, a physician who is treating a patient with diverticulitis must prescribe antibiotics that combat both types of bacteria. According to Dr. Kleier, "[i]f you only kill one, the other is sometimes not suppressed." By only prescribing Cipro, to which aerobic bacteria are susceptible, Dr. Kleier and Dr. Blackston opined that Dr. Pruett failed to meet the standard of care.

19

¶35.  The Hartels also introduced a microbiology report ordered by Dr. McKenney prior to surgery on May 15, 1998,[14] containing the results of an anaerobic culture of Betty's abdominal fluid.  The culture revealed "moderate growth" of four types of anaerobic bacteria in Betty's colon: peptostreptococcus asaccharolyticus, bacteroides uniformis, fusobacterium varium, and capnocytopha species.  With regard to the peptostreptococcus asaccharolyticus, the report stated that it would be 85-95% susceptible to the antibiotic metronidazole (marketed under the trade name Flagyl) and 70-84% susceptible to the antibiotic clindamycin (marketed under the trade name Cleocin).  With regard to the bacteroides uniformis, the report stated that it was 95% susceptible to metronidazole.  According to Dr. Kleier, Cipro:

> was very effective, and it killed all those germs.  It did not effect [sic] at all the aerobic organisms, the ones that grow in the absence of oxygen.  Subsequent [sic] that was what was cultured out at the time of her surgery, nothing but anaerobic organisms.  So when you kill one, you allow the other organisms freedom to grow without resistence [sic] because you haven't provided antibiotics.

Following surgery, Dr. McKenney prescribed Claforan, an antibiotic to which anaerobic bacteria are susceptible, for Betty.

¶36.  Not only was evidence presented by Biloxi Regional and Dr. Pruett that the appropriate standard of care was met, their experts likewise refuted the Hartels' expert's opinions.  Dr. Stodard testified that, in his expert opinion, prescribing only Cipro to a patient suffering from diverticulitis is sufficient to meet the applicable standard of care.  Dr. Stodard testified that he had treated "hundreds" of patients for diverticulitis "over the last 22 years."  According to Dr. Stodard, Dr. Pruett "prescribed an antibiotic that I use for this all the time

---

[14]Dr. Pruett last saw the patient on May 12, 1998.

and gave her appropriate discharge instructions. And so that is it in my opinion why he did indeed meet the standard of care."[15] Dr. Stodard testified that "[h]e treated her exactly as I would have treated her under the same circumstances."

¶37. Dr. McGee likewise testified that in his expert opinion, Dr. Pruett met the applicable standard of care in his treatment plan for Betty. Regarding mild diverticulitis, Dr. McGee stated, "I've treated hundreds of patients. I've done probably several hundred surgical resections for diverticulitis in the 23 years I've been in practice." According to Dr. McGee:

> I've been using quinolones, Cipro and more recently Levaquin which is a more recent type of quinolone almost identical to Cipro except that you just give it once a day.
>
> I've been using it for over ten years very effectually for treating mild acute diverticulitis. Not only that but in my consultation in the emergency room I frequently encounter the treatment plans of the emergency room physicians. And that's routinely used by the emergency room physicians at our hospital, the second busiest emergency room in the state. And it's very effective. In fact . . . since using the quinolones, I have never had a patient that progressed to requiring surgical treatment for that episode of the disease.

As to Dr. Pruett's treatment plan, Dr. McGee testified:

> I would not have changed anything. In fact this is a routine consultation that I do in the emergency room at Forrest General where I discuss the treatment plan with the emergency room physicians when they have questions about whether their diagnosis is correct or whether their treatment plan is correct, and this is a very accepted form of treatment for me, and I approve it.

¶38. "Our case law is axiomatic on the proposition that the jury is arbiter of the credibility of testimony." *Collier v. State*, 711 So. 2d 458, 462 (Miss. 1998). At trial, the jury weighed the conflicting testimony of well-qualified experts on the subject of whether or not Dr. Pruett

---

[15]Dr. Stodard added, "the standard of care did not require [Dr. Pruett] to treat her any differently than what he did treat her with."

21

satisfied the applicable standard of care in his treatment plan for Betty. The jury then found in favor of Dr. Pruett and Biloxi Regional. Given that conflicting testimony, and weighing the evidence "in the light most favorable to the verdict[,]" *Bush*, 895 So. 2d at 844, this Court concludes that the jury verdict in favor of Dr. Pruett and Biloxi Regional does not "sanction an unconscionable injustice." *Id*. Accordingly, this Court finds that the circuit court did not abuse its discretion in denying the Hartels' motion for new trial.

## CONCLUSION

¶39.   Based upon the aforementioned analysis, this Court affirms the judgment of the Circuit Court of Harrison County.

¶40.   **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. DIAZ, P.J., AND GRAVES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**