ISHEE, J.,
 

 for the Court.
 

 ¶ 1. Following a trial in the Circuit Court of Humphreys County, the jury returned a verdict in favor of the defendants, Belzoni Tractor, Inc., (Belzoni) and Deere & Co. (Deere). The jury found that Duett Landforming, Inc., (Duett Landforming) had failed to prove that Belzoni and Deere had breached the implied warranties of merchantability and fitness for a particular purpose with regard to the Deere tractors that Duett Landforming had purchased from Belzoni. Aggrieved by the jury’s verdict, Duett Landforming appeals and asserts two issues:
 

 I. Whether the circuit court improperly allowed Scott Cook to give prejudicial testimony concerning the tractors’ engineering without being disclosed or qualified as an expert.
 

 II. Whether the jury’s verdict is against the overwhelming weight of the evidence.
 

 Finding no reversible error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Brookie Duett (Duett) was in the business of dirt moving, leveling, and building catfish ponds in the Mississippi Delta. Prior to purchasing the tractors at issue, Duett’s business, Duett Landform-ing had operated a number of John Deere tractors, model number 8970. Seeking to upgrade his tractors, Duett Landforming rented and later purchased from Belzoni four new John Deere tractors, model number 9400. Initially, Duett Landforming rented two 9400 tractors in July 1998, and it took delivery of a third 9400 tractor in October 1998. The company purchased those three 9400 tractors in December 1998, and it purchased a fourth 9400 tractor in January 1999.
 

 ¶ 3. Duett negotiated with Larry Shur-den, who was the dealer for Belzoni, to purchase the four tractors. Duett could not recall anything specific that Shurden told him about the tractors, nor could he remember anything from the brochure on the 9400 tractor on which he relied. Duett did not speak with anyone at Deere about the tractors prior to purchasing them. Nevertheless, Duett claimed that Shurden was familiar with Duett’s business and that
 
 *606
 
 Shurden knew the type of work for which the 9400 tractors would be used.
 

 ¶ 4. Duett testified that in the summer of 1999, the 9400 tractors began experiencing problems. The first problem that Duett experienced involved a transmission running hot. Later, he described problems such as: (1) the axle seals would leak; (2) the brackets holding the hydraulic lines would break; (3) the center pin that was involved in allowing the tractor to turn would break; (4) pressure would cause the fuel cap to fall off and would cause fuel to spray
 
 [1]
 
 ; (5) the hydraulic tank would leak; and (6) it was difficult to remove some of the bolts.
 

 ¶ 5. Most importantly, Duett testified about problems with the tractor gudgeons. According to Duett, a gudgeon is a large pipe that allowed the tractors to twist.
 
 [2]
 
 He said that the gudgeons would wear down, which would cause the tractors to ride badly. Duett stated that he had also experienced problems with the gudgeons on the 8970 tractors, but he operated them for more hours before experiencing any problems with them. He could not remember how many gudgeon problems he had with the 8970 tractors, but he mentioned at least two instances. He claimed that he lost business because of the unreliability of the 9400 tractors, and he also claimed that he lost resale value on them.
 

 ¶ 6. Shurden testified that he offered Duett some options to alleviate the problems caused by the 9400 tractors, such as trading in one or all of the 9400 tractors, replacing the 9400 tractors with used 8970 tractors, keeping a 9400 tractor in stock for Duett to rent, or keeping a 8970 tractor in stock for Duett to use rent free. However, Duett never accepted any of Shur-den’s offers. According to Shurden, the Deere warranty covered the tractors for two years or 2,000 hours, whichever came first, and Deere made every covered repair on the 9400 tractors. Scott Cook, Deere’s corporate representative, testified that Deere provided an additional $24,000 worth of repairs beyond the warranty at no cost to Duett.
 

 ¶ 7. Duett Landforming called Charlie Sanders, a consultant, as an expert witness in rental value, value of equipment, and general equipment repair knowledge. Sanders testified as to the damages that Duett Landforming suffered because of the 9400 tractors. According to Sanders, Duett Landforming lost a total of $114,914 on the resale value of the tractors and between $100,000 and $150,000 “rental value” for the four tractors because of their downtime. On cross-examination, Sanders admitted that Duett Landforming had put more hours on the tractors than was the average in the industry. For example, at the time that the company traded in tractor number 11013 in March 2002, Sanders said that it had 4,114 hours logged on it, which was more than twice the industry average of 1,800 hours. None of the tractors had been used for fewer than 3,152 hours.
 

 ¶ 8. Cook, who was Deere’s engineering manager for the 9000 series tractors, testified on behalf of Deere and Belzoni. He had not inspected the tractors at issue, but he initially explained some of the design differences between the 8970 series and the 9400 series tractors. Although the 9400 was a newer series, it incorporated the same transmission as the 8970, with
 
 *607
 
 minor modifications. As for the gudgeon on the 9400 tractors, Cook testified it incorporated a bushing-style bearing; whereas, the 8970 tractors incorporated a tapered rolling bearing. Deere switched to the bushing-style bearing because of some sealing issues in the 8970 tractors with the tapered rolling bearings that required daily maintenance. Deere discovered that in eases of extreme oscillation— when the front of the tractor tips relative to the rear — debris could enter the gudgeon and cause problems with the 9400 tractors. Cook did not deny that Duett Landforming had experienced problems with the 9400 tractors. However, he noted that it had used the tractors for many more hours than what an average user would. Cook rated the company’s land-forming operation as some of the most strenuous work that Deere’s tractors could perform, describing it as a nine or a ten on a ten-point scale.
 

 ¶ 9. When Cook was questioned on direct examination about the effect of pushing one tractor that was stuck in the mud with another tractor, Duett Landforming objected to his testimony as being that of an expert witness. In response, Deere argued that Cook would testify as to facts, not opinions; therefore, it was not expert testimony. The circuit court overruled the objection and allowed Cook to testify about the engineering strains that are placed on a tractor when it is pushed with another tractor. Cook’s conclusion was that pushing the tractor would put a different strain on the gudgeon than the tractor normally experienced, and the act would bring in more debris through the seal. He contrasted pushing a tractor to pulling or towing a tractor, in which cases the strains on the gudgeon would be similar to normal operation.
 

 ¶ 10. According to Cook, Deere would not try to build a tractor that could not break because customers would not be able to afford it, and it would not be functional for customers. He said Deere expected its tractors to need occasional servicing. In the present case, he testified that Deere performed every required warranty repair on all four of Duett Land-forming’s tractors. He- testified that Deere had done everything to uphold its end of the implied warranties and had also gone beyond what was necessary to repair the tractors — providing an additional $24,000 in repairs that was not required under the warranties. Duett Landforming had also been offered concessions to extend the warranties on its tractors and to upgrade the bearings on the 9400 tractors, and it had been offered trade-in incentives on newer tractors.
 

 ¶ 11. The jury returned a verdict finding that Belzoni did not breach an implied warranty of merchantability or fitness for a particular purpose.
 
 [3]
 
 The jury also returned a verdict finding that Deere had not breached any implied or express warranties. After the circuit court denied Duett Landforming’s motion for a judgment notwithstanding the verdict, he timely filed the present appeal.
 

 DISCUSSION
 

 I. Expert Testimony
 

 ¶ 12. Duett Landforming first takes issue with the circuit court’s decision to allow what he claims amounted to expert testimony from Cook. According to Duett Landforming, the circuit court improperly allowed Cook to give expert testimony when Cook was never disclosed or qualified as an expert. The testimony with which Duett Landforming takes issue is
 
 *608
 
 Cook’s engineering testimony concerning the tractors’ gudgeons and the possible effects that pushing a tractor with another tractor could have on the gudgeons. After Duett Landforming’s objection was overruled, that exchange continued as follows:
 

 Q. Mr. Cook, you were explaining to the jury, tell us what — if a tractor is pushing on the front of this tractor, what engineering strains there are on a tractor that is stuck. And if you want to use this model, I’ll be glad to hand it to you.
 

 [[Image here]]
 

 A. When a tractor is pushing on the nose or the front end of the tractor, what tends to happen is, the front of the tractor is pushed up.... [Y]ou tend to load the gudgeon or the spindle area right here and put a bending load on it in this direction where it’s in compression on the top side and tension on the bottom side. That’s different than it is normally loaded. That’s one of the things that pushing causes a different loading than most of the tractors in this application.
 

 Q. Okay. What effect would that pushing and that motion have on the bushing seal?
 

 A. As you can see, the motion here would cause that — that gap there to change and so it tends to work it and would tend to bring more debris through that seal. As that seal gets breached and you continue to do that, even if it’s on an infrequent basis, you tend to pump material into that — that bearing.
 

 [[Image here]]
 

 Q. Would there — if a tractor is pushing another tractor, would you explain to the jury what forces from an engineering standpoint apply to the tractor that is pushing?
 

 A. The tractor that’s pushing would have a similar set of forces and would tend to close up that gap and so both the tractor being pushed and the tractor pushing would tend to see that type of loading.
 

 [[Image here]]
 

 Q. I don’t believe it’s shown in this picture, but I believe that there’s another picture that Mr. Cote showed yesterday that showed a tractor being pulled by a bulldozer. If — -if a bulldozer hooks up to this pan and pulls, what are the forces that are applied to the tractor up here in this gudgeon area?
 

 A. Being pulled from the rear is essentially the same as the tractor pulling forward so the forces in the gudgeon area would be very similar to what they would be in a normal operation.
 

 Q. So that would not be — is it correct to say that that would not be as difficult on the bearing as the bushing?
 

 A. That is correct.
 

 Q. Now, did you ever personally inspect the tractors at issue in this case?
 

 A. No, I did not.
 

 ¶ 13. “The ‘admissions or exclusion of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion.’ ”
 
 Irby v. Travis,
 
 935 So.2d 884, 905(¶ 56) (Miss.2006) (quoting
 
 Miss. Dep’t of Transp. v. Cargile,
 
 847 So.2d 258, 263(¶ 16) (Miss.2003)). Upon review, this Court will reverse a case based on the admission of evidence only if it “results in prejudice and harm or adversely affects a substantial right of a party.”
 
 Blake v. Clein,
 
 903 So.2d 710, 722(¶ 30) (Miss.2005) (quoting
 
 *609
 

 K-Mart Corp. v. Hardy,
 
 735 So.2d 975, 983(¶ 21) (Miss.1999)).
 

 ¶ 14. Pursuant to Mississippi Rule of Civil Procedure 30(b)(6), Duett Land-forming requested that Deere make available a corporate representative to testify regarding, among other things: (1) “Defects discovered by Deere ... in regard to all gudgeons in the John Deere 9400 Series tractors ... (2) “Defects discovered by Deere ... in regard to all transmissions of the John Deere 9400 Series tractors ...”; and (3) “All alleged product performance problems involving John Deere 9400 Series tractors including, but not limited to, gudgeons and transmissions.” Cook, who oversaw the design of the 9000 series tractors, of which the model 9400 was included, was designated as Deere’s corporate representative to testify regarding the specified matters. At his deposition, Cook testified about the technical aspects of the tractors, including the design and purpose of the gudgeon and the known defects with it. Duett Landform-ing’s attorney also questioned Cook as to whether the push bars that Duett installed on the front ends of the 9400 tractors would have affected the gudgeons — the same issue about which Duett Landform-ing now argues that Cook should not have been allowed to testify. The deposition exchange proceeded with the defense attorney questioning Cook as follows:
 

 Q. Okay. Go to Bates number 1720 and read that top part, the very top of the, start out four-wheel drive tractor.
 

 A. All the four-wheel drive tractors we saw were equipped with pusher bars attached to the front frame. We discussed this with the TAM, or territory aftermarket manager, and suggested that any equipment attached to the front axle of these tractors should reach under the axle and attach to the frame behind the front axle.
 

 Q. Do you know why that statement was made?
 

 [[Image here]]
 

 A. The first one we do not recommend pushbars on any of those four-wheel drive tractors with scrapers.
 

 Q. And why not?
 

 A. Because that is not an approved application. We do not test for it and do not recommend it.
 

 Q. Do you have any warning put out in your literature and tell them not to do that?
 

 A. I can’t answer that, sir. I don’t know if that’s in there or not. That’s a vehicle modification.
 

 Q. Would that have anything to do with the gudgeon or would you know?
 

 A. I would have to speculate. I don’t know, sir.
 

 ¶ 15. Despite the presence of such testimony in Cook’s deposition, Duett Land-forming introduced the deposition into evidence during his case-in-chief. This was prior to the alleged improper testimony that was elicited from Cook during the defense’s case. Duett Landforming played a tape recording of the deposition before the jury and then introduced a transcript of the deposition in evidence. In the deposition, Cook did not specifically answer the question about whether pushing the tractor with the push bar would cause the gudgeon problems. However, after the questions concerning the push bars, the defense attorney continued to ask Cook about the various modifications that Duett had made to the tractors and whether those modifications would have adversely affected the gudgeons. When Cook was later questioned at trial, he said that push
 
 *610
 
 ing the tractor could possibly cause damage to its gudgeon.
 

 ¶ 16. From his deposition and from the trial testimony, it was clear that Cook had not inspected any of Duett Landforming’s tractors. He did not testify that Duett caused the gudgeon problems by pushing his tractors, and he did not give an opinion as to why Duett Land-forming’s tractors experienced problems. Nevertheless, Cook’s testimony was in the nature of expert testimony. Cook was neither disclosed as an expert witness prior to trial nor accepted as an expert at trial; therefore, it was improper for him to give expert testimony. We note, however, that Duett Landforming initially brought up this matter by playing a tape recording of Cook’s deposition for the jury. Therefore, any objectionable engineering testimony that Cook gave was initiated when Duett Landforming introduced the deposition in which the jury heard Cook speak at length about the design of the 9400 tractors, the gudgeon problems they experienced, and the possible effects that Duett’s modifications might have had on the gudgeons. The supreme court has held that “as a general rule, the issue of whether a party opens the door for an opposing party to inquire about otherwise inadmissible evidence, lies within the sound discretion of the trial court.”
 
 Hartel v. Pruett,
 
 998 So.2d 979, 988(¶ 22) (Miss.2008) (quoting
 
 APAC-Miss., Inc. v. Goodman,
 
 803 So.2d 1177, 1185(¶ 35) (Miss.2002)). We find that whether the circuit court found the testimony to be proper layperson testimony or not was not dispositive of the issue. Duett Landforming opened the door for such testimony by playing the tape recording of Cook’s deposition for the jury. Therefore, we find it was within the circuit court’s discretion to allow the defense to continue the line of questioning.
 

 ¶ 17. In the present case, the circuit court did not explain its decision to admit Cook’s objectionable testimony; therefore, we are left in the dark as to the rationale behind the ruling. Deere argued at trial, and continues to argue on appeal, that Cook’s testimony amounted to factual information of which he had knowledge; therefore, he claims it was not expert testimony. However, in
 
 Palmer v. Volkswagen of America, Inc.,
 
 904 So.2d 1077, 1092(¶ 64) (Miss.2005), the supreme court stated:
 

 To be clear, the-test for expert testimony is not whether it is fact or opinion. The test is whether it requires “scientific, technical, or other specialized knowledge beyond” that of the “randomly selected adult.” If so, the testimony is expert in nature, and must be treated in discovery, and at trial, as such.
 

 Whatever the circuit court’s reason for allowing the testimony, “we may on appeal affirm the decision of the trial court where the right result is reached, even though we may disagree with the trial court’s reasons for reaching that result.”
 
 Magnolia Healthcare, Inc. v. Barnes,
 
 994 So.2d 159, 162(¶ 12) (Miss.2008) (quoting
 
 Pass Termite and Pest Control, Inc. v. Walker,
 
 904 So.2d 1030, 1032(¶ 6) (Miss.2004)). In the present case, we find that although Cook gave improper expert testimony, it was within the circuit court’s discretion to allow that testimony because Duett Landforming initiated that line of questioning when its attorney played the tape recording of Cook’s deposition, which covered the same issue to which Cook testified at trial.
 

 II. Judgment Notwithstanding the Verdict
 

 ¶ 18. In Duett Landforming’s second issue, it alleges that the evidence did not support the verdict that the jury returned. Duett Landforming claims that it presented a clear case of breach of implied
 
 *611
 
 warranties of merchantability and fitness for a particular purpose, and it claims that no reasonable juror could have returned a verdict finding that there was not a breach of those warranties.
 

 ¶ 19. A motion for a judgment notwithstanding the verdict tests the legal sufficiency of the evidence.
 
 White v. Yellow Freight Sys., Inc.,
 
 905 So.2d 506, 510(¶ 6) (Miss.2004) (citing
 
 Tharp v. Bunge Corp.,
 
 641 So.2d 20, 23 (Miss.1994)). The circuit court must consider all the evidence in a light most favorable to the nonmoving party.
 
 Id.
 
 (citing
 
 Janssen Pharmaceutica, Inc. v. Bailey,
 
 878 So.2d 31, 54 (¶ 107) (Miss.2004)). “If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable jurors could not have arrived at a contrary verdict,” then the circuit court must grant the motion.
 
 Id.
 
 This Court applies a de novo standard of review when considering a circuit court’s denial of a motion for a judgment notwithstanding the verdict.
 
 Irby,
 
 935 So.2d at 888(¶ 9) (quoting
 
 Poole ex rel. Poole v. Avara,
 
 908 So.2d 716, 726(¶ 24) (Miss.2005)).
 

 ¶ 20. Mississippi Code Annotated section 75-2-314 (Rev.2002) provides for an implied warranty of merchantability. Under section 75-2-314(1), “a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.” Section 75-2-314(2) further provides that for goods to be merchantable, they “must be at least such as”:
 

 (a) Pass without objection in the trade under the contract description; and
 

 (b) In the case of fungible goods, are of fair average quality within the description; and
 

 (c) Are fit for the ordinary purposes for which such goods are used; and
 

 (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
 

 (e) Are adequately contained, packaged and labeled as the agreement may require; and
 

 (f) Conform to the promises or affirmations of fact made on the container or label if any.
 

 ¶ 21. First, Belzoni and Deere were merchants who sold tractors; therefore, the implied warranty was applicable. However, they presented testimony to support their position that they did not breach the implied warranty. The fact that the 9400 tractors experienced more problems than Duett Landforming’s previously-owned 8970 tractors does not necessarily mean that they were not merchantable. “The implied warranty of merchantability is not intended to guarantee that the goods be the best or of the highest quality — the standard is measured by the generally acceptable quality under the description in the contract.”
 
 Johnson v. Davidson Ladders, Inc.,
 
 403 F.Supp.2d 544, 551 (N.D.Miss.2005) (quoting
 
 Beck Enters., Inc. v. Hester,
 
 512 So.2d 672, 676 (Miss.1987)). “Where a product conforms to the quality of other similar products in the market, it will normally be merchantable.”
 
 Id.
 
 There was testimony that Duett Land-forming was engaged in an intensive operation building catfish ponds and that it operated the tractors for some time before it encountered any problems with them. Furthermore, at that point in the life of the tractors, the company had operated them well in excess of the number of hours that was average for the 9400 tractors.
 

 ¶ 22. While Duett Landforming presented testimony that supported its claim of a breach of the implied warranty, Deere and Belzoni presented evidence to the contrary. We find no merit to Duett Land-forming’s claim that the circuit court
 
 *612
 
 should have granted its motion for a judgment notwithstanding the verdict with regard to the implied warranty of merchantability.
 

 ¶ 23. As for the alleged breach of an implied warranty of fitness for a particular purpose, Mississippi Code Annotated section 75-2-315 (Rev.2002) provides, in part, that:
 

 Except as otherwise provided in this section, where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller’s skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.
 

 ¶ 24. Shurden admitted that he was aware that Duett was in the business of building catfish ponds. However, Duett could not remember any assurances that Shurden gave him as to how the 9400 tractors would function, nor did he say that he relied on Shurden’s representations in making his decision to purchase the 9400 tractors. Duett said he had spoken to Shurden about the 9400 tractors, and he had also seen a video and looked at a brochure about them. The evidence did not reflect that Duett relied on Shurden’s “skill or judgment to select or furnish suitable goods.” Miss.Code Ann. § 75-2-315. To the contrary, Duett stated that he was the expert on building catfish ponds, and he was the person who had selected the 9400 tractors. As for how Duett decided to purchase the 9400 tractors, he said, “I wanted the bigger tractors and they were the only ones available sold by John Deere and I’d been buying John Deere tractors so — and had had good luck with them, so that’s the only one I wanted to try, I guess.”
 

 ¶ 25. We find that the evidence was such that reasonable jurors could have disagreed over whether Belzoni or Deere breached their implied warranties to Duett Landforming. Therefore, the circuit court did not err by denying Duett Landform-ing’s motion for a judgment notwithstanding the verdict. We find that this issue is without merit.
 

 ¶ 26. THE JUDGMENT OF THE CIRCUIT COURT OF HUMPHREYS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Duett testified that he installed valves to prevent this from occurring.
 

 [2]
 

 . The 8970s and the 9400s were articulating tractors, which means that they had a front and a back section that were connected at a central joint. The gudgeon was the piece that allowed the two pieces of the tractor to pivot or twist.
 

 [3]
 

 . After Duett Landforming rested its case-in-chief, the circuit court granted Belzoni's motion for a directed verdict on the claim that it violated any express warranties.